UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CRISTINA SERRANTES,

U.S. ...
2012 NOV -7 AM 11: 49
S.L. ... ...

Plaintiff,

12 Civ.    (    )

-against-

Police Officers "JOHN DOES 1-10" individually,
and the CITY OF YONKERS, New York,

**COMPLAINT**



Defendants,

**Jury Trial Demanded**

------------------------------------------------------------x

Plaintiff, CRISTINA SERRANTES, by her attorneys, The Bellantoni Law Firm, LLP, for

her complaint respectfully states:

## NATURE OF THE ACTION

1. This is an action for compensatory and punitive damages, proximately resulting from

conduct jointly engaged in by the Defendants while they were acting under color of the laws of

the State of New York, for violations of Plaintiff's rights as guaranteed by the Fourth

Amendment to the United States Constitution, 42 U.S.C. §1983.

## JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and § 1343.

## THE PARTIES

3. Plaintiff CRISTINA SERRANTES ("Plaintiff") is a resident of the Northern Counties.

4. Defendant Police Officers "JOHN DOES 1-10" who are sued in their individual

capacities, were at all times relevant to this complaint, employed by the City of Yonkers

(hereinafter "City") as Police Officers.

1

## THE FACTS

5.     Plaintiff is a 51-year-old immigrant from the Phillipines who, until her unlawful arrest discussed herein, had never had any negative contact with law enforcement.

6.     At all times relevant herein, Plaintiff did not have an entirely fluent command of the written or spoken English language, which is readily apparent upon initial contact with Plaintiff.

7.     At all times relevant herein, Plaintiff was a resident of 57 Rigby Street, Apartment 2F, Yonkers, New York.

8.     At all times relevant herein, Plaintiff and her husband resided at that location with her daughter Anna Loftus, Plaintiff's son-in-law Christopher Loftus, and Plaintiff's two grandchildren.

9.     The apartment in which Plaintiff resides is located on the second floor of the two-story apartment building.

10.     The side entrance of the apartment building opens into a common foyer area wherein stairs to the second floor apartment in which Plaintiff resides are located.

11.     On December 2, 2011, at approximately 2:50 p.m., Plaintiff was alone inside of the apartment babysitting for her 11-month-old and 11-year-old grandchildren.

12.     At or around that time, an individual purporting to be a United States "postal worker" knocked on the front door of the apartment building (the "postal worker").

13.     Upon information and belief, the "postal worker" (JOHN DOE #1) was a police officer with, and/or was acting as an agent of, the City of Yonkers Police Department.

14.     Plaintiff recognized that the "postal worker" was not the usual mailman.

15.     The "postal worker" asked her if Christopher Loftus resided in the building, to

16. The "postal worker" told Plaintiff that he had a package for Christopher Loftus; however, he did not have any package in his hands.

17. Plaintiff replied that Christopher Loftus was not at home.

18. Plaintiff, who relies on prescription glasses in order to accurately read the printed word, was asked by the "postal worker" to sign a receipt for the package.

19. Plaintiff signed the piece of paper, but not having her glasses on, she was unable to read the words contained thereon.

20. Upon information and belief, the individual identified as the addressee/recipient of the package was not a resident of the apartment.

21. Plaintiff then asked the "postal worker", "Where's the package?"

22. The "postal worker" replied, "I'll get the package" and proceeded to exit the apartment building.

23. Plaintiff observed the "postal worker" outside of the apartment building through the apartment window.

24. Plaintiff observed the "postal worker" on a cell phone having a conversation with an unidentified individual.

25. Plaintiff observed the "postal worker" outside on the phone for several minutes.

26. During this time, Plaintiff observed that the "postal worker" was standing next to a vehicle with a brown package sitting on its roof.

27. After a several minutes had passed, the "postal worker" returned to the ground level front door of the building.

28. Plaintiff, who was keeping an eye on her toddler-aged grandchild inside of the apartment, asked the "postal worker" to please bring Christopher Loftus' package upstairs.

29. The "postal worker" brought Loftus' package upstairs and, as requested by Plaintiff, he placed the package on the floor just inside of the doorway of the apartment.

30. The "postal worker" then exited the apartment building.

31. At no time did Plaintiff possess, hold, take, control, open, or inspect Christopher Loftus' package.

32. The package was not addressed to Christopher Loftus.

33. The package was addressed to a third party who did not reside in the apartment.

34. Plaintiff did not observe the name or address contained on the package.

35. Plaintiff did not in fact know, nor did she have any reason to know, what the contents of the package were.

36. Within seconds of the "postal worker" leaving the apartment doorway, at least four (4) individuals dressed in plain clothing came into the apartment building, up the stairs and into Apartment 2F.

37. Though Plaintiff later learned that the individuals were police offices, none of the plain clothes individuals had any identification on their person, no badges were displayed and none of the individuals identified themselves verbally to Plaintiff as police officers ("JOHN DOES 2-10" AKA "the police officers").

38. One of the police officers informed Plaintiff that he had a search warrant from the court and directed her to sit down near the apartment door.

39. None of the police officers showed, presented or displayed any search warrant to Plaintiff, nor did any police officer provide Plaintiff with a copy of any search warrant.

40. One of the police officers instructed Plaintiff to call Christopher Loftus on the phone.

4

phone.

41. The police officers promised Plaintiff that if she got Christopher Loftus to return home they would not take her to jail.

42. The police officers knew, should have known and had reason to know that Plaintiff had no knowledge or reason to know the contents of the package.

43. The police officers knew, should have known and had reason to know, that Plaintiff was not the target of their investigation into the trafficking of marijuana.

44. The police officers knew, should have known and had reason to know that Plaintiff had no criminal culpability or mens rea in connection with the package and its contents.

45. Plaintiff was very scared and confused as to why the police officers were in her home.

46. Plaintiff called her daughter to get in touch with Christopher Loftus because Plaintiff did not have his telephone number.

47. When Christopher Loftus finally arrived home, the police officers spoke with him in another room.

48. Christopher Loftus informed the police officers that the package belonged to his friend, whom he allowed to have packages sent to his home as a result of difficulties that his friend had receiving packages at his own residence.

49. Christopher Loftus informed the police officers that Plaintiff did not know what was in the package and that she had no involvement in this incident at all.

50. In violation of their promise not to arrest Plaintiff and take her to the police station, knowing that Plaintiff had no criminal culpability, with information from Christopher Loftus that Plaintiff did not know what was inside of the package, knowing that Plaintiff's name

believe that Plaintiff had committed any criminal offense, the defendant police officers arrested Plaintiff, took her into custody and transported her to the City of Yonkers police department.

51. The package remained sealed until Plaintiff and Christopher Loftus arrived inside of the police station.

52. Inside of an interrogation room, the package was opened and for the first time, Plaintiff observed that the package contained a substance that she was informed by the police officers was marijuana.

53. Plaintiff was in tears, at which time the defendant police officer stated to her, "Cry in front of your son-in-law – he's so stupid."

54. Then one of the defendant police officers directed a second defendant officer, "Put them both in jail".

55. The defendant officers used Plaintiff solely as a bargaining tool and leverage to induce Christopher Loftus to admit culpability when they knew that Plaintiff had no knowledge of the marijuana and possessed no criminal culpability.

56. One of the defendant police officers informed Plaintiff, "I'm sorry this happened to you."

57. Plaintiff was incarcerated from Friday, December 2, 2011 at 2:50 p.m. until she was released from custody on Monday, December 5, 2011 at around 4:30 p.m.

58. Plaintiff was at all times aware of her confinement, she did not consent to the confinement and the defendant police officers did not have any privilege or probable cause to have arrested and/or confined her against her will.

59. Plaintiff was charged with the felony of Criminal Possession of Marijuana in the First Degree in violation of Penal Law § 221.30.

60. Plaintiff was consequently forced to retain an attorney, incurring legal fees in the amount of $7,500.00 in order to defend the baseless charge.

61. The felony charge against Plaintiff was ultimately dismissed in its entirety.

62. Christopher Loftus subsequently pled guilty in connection with the above-detailed arrest.

63. Yonkers City Code Article XII, § C12-11(a) provides that the City of Yonkers "shall indemnify and save harmless [a] police officer from any judgment of a court . . wherever such action, proceeding or judgment is for punitive or exemplary damages arising out of a negligent act or other tort of such police officer . . ."

64. Plaintiff has suffered and continues to suffer damages as a direct consequence of defendants' actions, including loss of freedom, fear of police, embarrassment, humiliation, out-of-pocket losses including defense costs and emotional distress, anxiety, stress, sleeplessness, stomach aches, high blood pressure, loss of her personal property, which to date has never been returned, and she has otherwise been rendered sick and sore.

65. Moreover, as a result of her incarceration and prosecution, Plaintiff was unable to travel to the Phillipines to visit her mother and take part in her family's reunion, where relatives from across the world were in attendance.

## AS AND FOR A FIRST CAUSE OF ACTION

66. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "65", inclusive.

67. Defendants' conduct violated Plaintiff's rights as guaranteed by the Fourth Amendment to the United States Constitution.

7

WHEREFORE a judgment is respectfully demanded:

a. Awarding against Defendants such compensatory damages as the jury may impose, but no less than $500,000,

b. Awarding against Defendants such punitive damages as the jury may determine, but no less than $1,000,000,

c. Awarding reasonable costs and fees, and,

d. Granting such other and further relief as to the Court seems just and proper.

Dated: Scarsdale, New York
November 7, 2012

THE BELLANTONI LAW FIRM, LLP

By: _____
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
914.367.0090
914.367.0095 (fax)